The next case called for oral argument is Stoecklin v. Stoecklin, counsel, whenever you're ready, please proceed. Excuse me. May I please report? My name is Mike Rosio. I'm here today arguing on behalf of the respondent appellate in this case, Mr. John Stoecklin. The issue before the court today really is whether or not the trial court used its discretion in making an award of child support. And I would just like to very briefly go through the history of this case. In December of 2012, the petitioner, Barbara Stoecklin, through her attorney, filed a petition for a will to show cause. And I would advise the court that as far as I know, that motion, that petition is still pending. It's never been addressed to my knowledge. It was also on the same day, the same time, a petition to modify child support. And the petitioner alleged that she had a reduction in her pay. The reduction in her pay was the result of her resigning her position with Senior Med Services, which is also known as Uvanta in southern Illinois. She resigned her petition as the pharmacist in charge. And as a result of that, the corporation reduced her salary by 15 percent, brought another pharmacist in, increased that pharmacist's pay the same 15 percent that they reduced Ms. Stoecklin's. And they moved forward. Ms. Stoecklin makes the argument that she had been notified by Mr. Stoecklin not to come to the office. It's not true. Ms. Stoecklin was notified by Gary Miller, who was in charge of the employees, not to come into the office because it was creating a real problem because John and Barbara Stoecklin were getting divorced and each of them owned one third of that corporation, owned the stock. He asked her for the time being to work from home. Counsel, let me ask you on that. The facts that you're arguing here, how were those established before the trial court? Basically, they were all established in the argument that Ms. Schaefer and I provided to the court and in memorandums that we provided to the court. I see on this issue she filed a memorandum, then you filed a memorandum, and then there was a reply filed. And there were allegations back and forth of here's what happened or here's what happened. And then the court made certain findings in its written order of May. But was there a stipulation of facts presented to the trial court? I know there was no trial, was there? There was not. The only, and I use the term loosely, hearing that we had was after I filed a motion to reconsider and we went in and there still was no testimony. It was all argument. Was there any written stipulation of facts submitted to the court that both parties agreed upon? To my knowledge, there is nothing written. However, I will tell the court that Ms. Schaefer and I did agree and stipulate to the facts before the court is my recollection. We stipulated that our memorandums were true and correct as far as we knew. And we based that solely on what our clients had told us in the documentation that our clients had provided us. But there was a disagreement between what those facts were? Absolutely. So you didn't stipulate it to a uniform set of facts? That's correct. Was this oral stipulation as to what the memorandum reflected part of the record or was this informal in chambers or what was the scenario? Judge, my recollection is that we stipulated to that in open court, but I don't believe there was any record of that at the time. I don't even believe there was a court report there at the time that Ms. Schaefer and I agreed that the facts were the facts. And I agree, Your Honor, that there was a difference in my position as to what the facts were and Ms. Schaefer's position as to what the facts were. I know there's been a problem, a shortage of court reporters, especially also in the Third Circuit. Well, it's not Third Circuit. I'm sorry. It's First Circuit. But statewide, that's a problem. Do you know if there was any recording device when you made your argument before the court? There was no recording device, and there is none in Williamson County that I'm aware of, except I think there is one now in one of the brand-new courtrooms. But in the courtroom where we do our family law cases, there is no recording device, or at least there wasn't at the time. Right. But I will tell the court that there would have been a court reporter available had we asked for one. I see. Thank you. I'm pretty sure of that. Counsel, there is a dispute in the case whether or not Barbara's termination was voluntary or involuntary. Her termination from as the pick was – and our position is that she resigned. She provided us a document, a written document, which is a part of the record that says basically I quit as the pick. And the argument was they based it on the administrative code in what a pick is supposed to do. However, I can tell the court that she was the pick from the day the corporation was formed, operated from home often, and still maintained her position as pick for several years until this divorce happened. And the divorce, I think, to say is contentious is probably an understatement. But her position was that she had to be physically present a certain percentage and was not able to because of her not being permitted to be. Correct. Well, the administrative code states she's got to be there at least eight hours a week. And the fact is that Mr. Miller asked her not to come to the office while John was there. And later on, there were many, many opportunities for her to come to the office. But it's her position that she wasn't. I'm just asking her position. Her position is she was not allowed to come to the office. Right. And, I mean, if you look at Paragraph 7 of her petition to moderate, she basically says she can't be the pick if she's not on site. But the – and then in April, the Board of Senior Med Services said that all employees scheduled for work in-house shall be present at the business office during those house hours and that no employee shall be allowed to telecommunicate for in-house shifts. They – the board assigned Ms. Stettman time to be in-house to do her job as a pharmacist when John Stettman was not present because he has several other duties as the president of the corporation. And he's out of the office a large portion of the time. And there was no conflict that I'm aware of when she was there and he wasn't or when he was there and she wasn't. And that was the goal of the board was to put her in a position where she could have continued that, but she didn't. Now, I will tell you that this particular agenda item was not voted on until after she had resigned her position as pick. And I don't want to mislead you and make you think that that happened before. But, I mean, there are just so many reasons why they wanted her there if she was going to remain employed as a pharmacist because of the duties that the pharmacists are required to do while they're in-house versus if they stay at home and do nothing but check scripts, which is all she did. She didn't answer the telephone. She didn't physically check any of the orders that went out. She didn't respond to any e-mails. She did not have to talk to any of the staff to assist the pharmacy assistants who actually filled the scripts. She didn't have to check those, physically check that medication to ensure that it was in there. These are all things that a pharmacist that's in-house has to do. And one of the things that she argued was, well, I checked all these scripts from home, and I checked 100, and everybody else checked 20. And I'm just – I don't recall exactly what the numbers are, but it could be something like that. But she didn't do anything else. She sat at a computer and compared two screens. That's all she did. She should have been checking 500 a day, at least in Mr. Steckland's opinion, considering that she had none of his other responsibilities. So our position is that she voluntarily reduced her income by resigning as the pig and that this court should not affirm and that the trial court abused its discretion in ordering John Steckland to pay child support. Now, the judgment and the merit settlement agreement that they entered into said that each would pay 50 percent of the expenses of the child and that there were certain duties required of each of them if they wanted reimbursement. Like they had to provide a receipt, and they had to do this monthly. The rule of show cause, which has never been addressed, goes to those particular issues. And again, it's not here before the court because it's never been addressed. But our position was that she didn't do those duties, and that was the problem with this alleged 50-50 agreement to split the expenses. Furthermore, if you take all of the expenses that were ever presented to Mr. Steckland, they averaged out about $500 a month in uncovered expenses under this settlement agreement that they entered. The expenses were for the Catholic school at Heron. The payment for its tuition, fees, and books has been divided. That was never an issue. Clothing for the child from that school, because they wear uniforms, was never an issue. Those were all divided. The real issue became his extracurricular activity expenses, his baseball, his football, the bats, the gloves, the balls, the uniforms and things that he accumulated. And I would also add to the court that at no time did this young man's standard of living ever deviate from what it was during the period of time these people were married. They make over $300,000 gross a year in dividends from senior bed services. That didn't include their salary. That's their dividends. Ms. Steckland still receives that money today. So she's certainly not destitute. And this is a high-income case. I think the briefs cover that pretty well. And I think this court is certainly aware of the standard of review for an abuse of discretion. And it's our opinion that in this case, even if you look at this case, looking at Ms. Steckland's financial affidavit, she says it costs a little over $2,000 a month for this child. If that's the case, why is Mr. Steckland paying the amount of support that the judge ordered? Why isn't he just paying $1,000? Because there's two other things. First off, Ms. Steckland says, I'm not trying to avoid my responsibilities. I'll still pay half of his expenses. That's in her brief. And the second thing that's in her brief, and I believe that is more telling about why she filed this petition to modify it, is she states in her January 10, 2014 memo, that's on pages 3 and 4, she says she's not asking for a reduction from the 50 percent. Quote, rather, petitioner has asked that respondent pay a monthly sum as and for child support so as to attempt to equalize the income of the parties. Now, that's maintenance. If you're going to equalize incomes, that's maintenance. Maintenance was waived a long time ago. Furthermore, had we ever had a maintenance issue, I don't believe Ms. Steckland would have qualified for maintenance at the time based on the equal income of the parties, which was substantial. Both of them. It was substantial. And I would ask that this court reverse the trial court, deny the petition for an increase in child support, and or send it back for a trial if you don't believe that there's enough evidence that you can move. And I thank you. Thank you, Counsel. Counsel? Thank you. Please record, Counsel Morizio. My name is Michelle Shaffer. I represent Barb Steckland, the petitioner originally, the athlete in this case. It's important, first, to address the factual issues that Mr. Morizio brought up because they are important in this court's determination. First off, when asking about how the facts were established in this case, given the continued animosity of the parties and given that we had been in court many times, and given that the parties had their own solid positions associated with this corporation, Mr. Morizio and I stipulated that we would each submit our factual interpretation covered with affidavits, covered with documents. Those things that we believed supported our positions, and we both agreed to the foundational elements of those documents so that the court could make a consideration on the credibility of them. We did so to try to attempt to avoid costs for our clients and try to attempt to avoid having a two-day hearing. Many of the facts were not in dispute associated with the child's needs. This was a family that had invested funds to establish this corporation during their marriage. This was a very wealthy, successful family. Barbara and John each began this company on an equal basis. They were both pharmacists. They were both educated. They were both capable. They made the decision when communicating with counsel that they would establish this corporation. John was deemed the president. Barbara at some point in time was the secretary, at some point in time the VP, and she did take on this title of pharmacist in charge. There were signed obligations to each of them. But it's important to note that in our position, this pick is really a red herring. Once the judgment was entered to divorce these parties, they still owned this corporation together. The judgment didn't divide the corporation. In fact, it obligated the parties to seek ways to obtain buyers, to seek ways to determine how they could most successfully continue this operation, all but divorce. And they wanted to do that. The history of this case is very clear in the record. There are numerous documents to support the viability of Barb Stecklin working from home and filling scripts. That's what she did. That was her job. She contributed substantially to the success of this business by doing so. And in that, when she was forced to no longer come to the business, and she was asked by the director of operations, Gary Miller, who owns 15 percent of the company, not to come in. While this divorce was underway, Barb, please don't come in. It's volatile. The employees feel uneasy. We really need a good environment. Can you just stay home and keep doing what you've been doing? And she didn't object to that because she personally didn't want to be subjected to it as well. But when she asked to pick, in this title she had, her pharmaceutical license was on the wall. That means if someone comes in to audit, if someone comes in to investigate, she's responsible. With the uneasiness. Counsel, let me interrupt just a moment and ask you a question. Again, the concern we have is the record that we're asked to rule on here on appeal. Do you agree that there was a dispute as to whether or not the termination of her employment was on her own free will and whether it was voluntary or not voluntary? I think there's two factors to that. Her giving up of that title, we agreed factually. She turned it in. She said, I can't be in the office. I can't be in the control room. She was locked out. I can't count the narcotics. That's the primary responsibility of the pick, to report to the DEA or any agency they may come in. Because she couldn't viably do that position, she told John, I'm going to give you the pick. He didn't bring a new pharmacist in. He just assigned that pick to another pharmacist that existed at the time. In her, they both have contractual agreements for their employment. There's nothing in her contractual agreement that says she's being paid to be the pick. She wasn't. She was paid a salary to be a pharmacist. So she didn't quit being the pharmacist. She handed in her title and said, I can't be in the office, so I can't do this part. Here it is. John, as president, and his right under the charter, unilaterally reduced her salary because she gave in the pick. And he unilaterally chose to increase the salary of another pharmacist. She was never paid for that. That was just something he chose to do. She didn't resign. She didn't stop doing everything that she had always done. She just couldn't have access to those material records to establish the security for this license. Because she was told by the DEA when she asked them, and, again, this is pursuant to her affidavit, that she would be the liable pharmacist if something were wrong. Well, the court made a factual finding that your client's discharge from employment was not of her own free will and was not voluntary. And I'm trying to determine how the court made that factual finding. There was no trial. There was no testimony. There's been a lot of facts thrown back and forth, which deal with whether or not there was good faith. Sure. Absolutely. And so let me go back. You're saying that I see on your memorandums you each attached documents as exhibits to your memorandums. And you're saying there was an agreement between that was presented to the court that those would be admitted into evidence and there was proper foundation for those? Correct. Was that stipulation done orally? It was in open court. Mr. Marizio is correct. When the court asked if we needed a hearing associated with the child support modification, we both suggested to the court that it would probably be less expensive for our clients and less time consuming for the court, knowing we probably weren't going to get a date for two or three months down the road, to submit the factual evidence that we believed supported the positions we had. And we didn't object to the foundational elements by either party. As a result, we've attached corporate minutes from the corporate decisions that were made subsequent to the divorce. We've attached the prescription-filled counts to support the viability of Barb Stepland as an employee. And I guess let me try to finish answering the question, too, about the resignation. There are two parts to this. Well, my question was, is there a dispute between the parties whether or not it was a voluntary termination of employment or not? And I think clearly, yes, there is. Is there not? I don't think there is in that. Barb acknowledges she resigned to PICC. That did not terminate her employment. That was a separate event. The PICC that she turned in resulted in Mr. Stepland unilaterally reducing her salary. She was terminated as a result of a subsequent corporate meeting for, under her contract, no cause. There's a provision in her contract, and this was months later. In September of 2012, she gave the corporation back the PICC and said, because I can't engage in these activities, you can select another. There were no complaints about it. There were no discussions about it. There were no notice given to her. She just got a nice paycheck, and it was reduced because that was the decision Mr. Stepland made. There were no corporate meetings or votes associated with that. In April of 2013, John Stepland brought in a special meeting of all the cronies that he works with and said, hey, we need to make sure everybody's here. I want everybody to be here. I know Barb's working home. I want her to be here now. So they all voted. Everybody's got to be here. Keeping in mind that, it only takes Barb Stepland and John Stepland to have a majority because collectively they own 66% of this corporation, and they started this corporation. So they vote that. So Barb gives them times when she can and cannot be in the office. She goes in the office. She has time off. John goes in the office. He has time off. In August of 2013, John called a special meeting and offered a termination, said we need to terminate Barb. She wasn't terminated for cause. If the justices will see the contract and the reasons in the minutes for her termination, it is under Section 7D, which in her contract is really 7E because there's no D, that she was terminated for no cause. She was given a 90-day notice, which gave either party the right to leave the employment relationship without any reason. And that's how they fired her. They could have fired her based upon all of these accusations based upon 7A, which says you've done something for cause to create a problem in our business that makes us not be successful. You're out. They didn't do that. And that's why we're here today. She did not voluntarily resign. She continued throughout the course of the post-judgment relationship, corporately, to work, to engage in scripts. And those documents that are attached reveal she was more than successful in doing the same thing she'd always done. He just had a vote, had everyone else agree. You know, it's a family business, but he was always the prez. So he always got to at least initiate the actions that he perceived to be in the best interest of the business. He voted to, he proposed to fire her, and they did. And that's the basis for the court's determination that she did not voluntarily quit her job. She did not voluntarily leave employment with the company. She was terminated in August of 2013. Ninety days later, she stopped getting paid, which I believe is why the court determined that the child support modification should take place effective January 1, 2014. So this was in effect when she was, in fact, terminated. She didn't initiate it. She didn't do anything to create it but for the things that she had always done, which was fill scripts rather successfully. The parties do have equivalent distribution incomes, but that is only based upon John Steadman's decision when and how and how much to distribute. So she's controlled by that as well. The difference that the court looked at to make a determination on whether a modification would occur was their incomes at the time the judgment was entered and the incomes when they came into court and we filed our documents. Barb lost her $140,000 salary. John Steadman kept his. And the court only looked at, if you will see the record and the exhibits attached, John Steadman's financial affidavit only contained salary income and income from a small DJ business that he had. John Steadman admitted that he made approximately $13,800 gross a month at the time we presented these facts and stipulations to the court on what our clients believed to be the evidence. Barb Steadman had zero. Now, if you look at their distributions, yes, they're equal. But the court looked at differences in their salary income to make the determination to award the child support. It is exactly 20% of John Steadman's net income that exceeds Barb Steadman. It's no more. It's based upon his salary and her salary. Because those distributions are not guaranteed, and traditionally those distributions went to pay income taxes for the shareholders. If the court looks at what the trial court analyzed and had to absorb in terms of factual information, the court's job was to weigh the credibility of those stipulations to determine whether child support modification should occur. The court found, I believe accurately, that Barb Steadman did not intentionally quit, did not intentionally do anything to lose her job. This is her company still today. She owns 33% of it still today. She didn't want to see it destroyed because it was her only ability to generate income for her family. Tyson Steadman, her minor son, lives with her primarily, no dispute. She buys his clothing primarily, no dispute. She provides the things he needs, no dispute. In fact, when the court looked at the information contained on this order to show cause that Mr. Marizio brought up, the primary reason for the order to show cause was because this original judgment said everybody pays 50-50. We're all going to contribute half to the child's expenses. That didn't happen. That was unsuccessful. They bickered and fought and argued over whether those expenses were really necessary for Tyson Steadman. The court had the right to consider that as well. The court entered the order to show cause, but Mr. Marizio is correct. It's not before the courts today. It's still yet pending because the court made a decision that, in good faith, Barb Steadman no longer had the same income she had at the time the judgment was entered. He considered 20% of John Steadman's salary income, and he ordered a child support order. It was $2,048 a month. If the courts will look at the financial affidavit of Barb Steadman, Tyson's expenses alone, and again, this is a wealthy family. This is a family that sent all of their kids to private schools, bought all their kids new cars, sent all their kids to all the great camps and all the travel expenses that it takes to go play in Chicago and Nashville. They have a couple of kids that are Division I soccer athletes, and these are people that had the financial ability to do anything they needed or felt they could do for their children. Tyson's the last child. And Tyson shouldn't, according to all of the cases that we all know well. I see my time is up. Thank you. He shouldn't be suffering because of an argument over parties that have significant funds and the payment of his support. Thank you. Counsel? I'll be very, very brief. First off, I want to point out to the court that the petition to modify child support was filed December 4th of 2012, nine, almost ten months before Barb was given notice that she was going to be terminated because of her failure to report to the office to work. But hadn't she already had a reduction in her salary? This petition was filed because she voluntarily gave up the positions to pick. Her income was reduced by 15 percent, what, 15, maybe $18,000 a year over 140. It was dropped that much. That's when she filed the petition, not because she got discharged. One of the reasons, and Ms. Schaefer pointed it out, one of the reasons that we did this and the manner we did it, we didn't, we couldn't get before the court. We couldn't get before the court. Ms. Schaefer's brief, her first brief, was filed in November of 2013 after the discharge. And this had all been pending from December, all the way to December, with no decision ever being made. So we decided we've got to do something. This is ridiculous that we're dragging and dragging and dragging. So that's why we agreed to do what we did. Or that's a part of my opinion as to why we did it. The other thing I want to tell the court, the distributions that are made to all the stockholders in this company are net income because their taxes are paid by the corporation before those distributions are given. Now, I cited, I said something a while ago about bar making in excess of $300,000 in distributions for 2014. That's true. But that included the taxes that had been paid. I don't have the breakdown of the amount of taxes the company paid for her. So she was given notice in August of 2013, seven months after this petition to reduce child support had been filed, that she was going to be discharged in November. So the reason we're here is because she filed a petition in December based on the fact that she lost the income that she received as the PIC. And she can argue all she wants that she was never given any money for the PIC, but that's not true. Her income from the very beginning of this corporation was based on the fact that she was the PIC and John Steckman was the president. That's why their incomes were set. And when she gave up those duties as the PIC, I can't imagine somebody expecting I can maintain the same salary, but I'm going to give up all these duties and these responsibilities. So we do have an argument about, I guess, whether or not she voluntarily gave up the PIC. My position is she didn't. Schaefer's position is that she did. Thank you very much. Thank you, Counsel. We appreciate the briefs and arguments, and both counsel will take them under advisement. Thank you.